Good morning, Your Honours. My name is Jesus Jesse Valdez here on behalf of the appellants. Can you speak up, please? Can you hear me better now? Yes. My name is Jesus Jesse Valdez here on behalf of the appellants, the estate of Sean Furr, the personal representative, Mr. Ghiassi, Mr. Jason Furr. You're going to need to keep your voice up while you're speaking. It's both. Maybe you need to get closer to the microphone, but you're just going to need to speak up, please. All right. I have a sore throat, so I have a cough drop, so I'm trying, so I apologize. And here also on behalf of the appellants, I would like to reserve two minutes for a rebuttal. Please keep track of your own time. Thank you. Thank you. We are here today because we believe the district court erred when it granted summary judgment to the defendants, City of Seattle, when there was genuine issues of material fact in dispute. Also, some of the material facts that were in dispute were recorded on a body cam, which was objective evidence. And we believe the court disregarded that objective evidence that should have went to the jury and not to the fact finder. The judge should have decided those issues. Some of those facts that were disputed. Sean turns the corner slowly, both hands clearly visible, holding his baby daughter unarmed, no weapons in his hands. The city's contention officer, Zach, says, I couldn't see his hand. It was underneath, below somewhere. That's why I took the shot. I couldn't see his hands. The video evidence contradicts that. Another dispute is. The answer might be I didn't see his hands rather than I couldn't see his hands. Well, what he stated is I didn't see his hands and because I couldn't see his hands. That's why I took the shot. But the video contradicts that. It clearly shows both hands. I'm obviously incredibly sympathetic to the baby, the mother and your client. But we focused on this little turning of the corner video. And my question really is a broader one. And that is, why don't we look at the fact that he fled from police for over 30 minutes? He was dangerously holding the baby at some point, you know, almost like dangling the baby. He had a gun. At whom he fired, it is unclear, but he had at one point fired a gun. So my question is why we don't look at the totality of the circumstances. We are rather than telescoped at this moment as they turn the corner in that corner. Well, we will, Your Honor. Totality of the circumstances. And those are the three factors. Severity where these actively fleeing in the immediacy threat of harm. And the biggest factor the U.S. Supreme Court has said is look at the immediacy. The moment the Ninth Circuit is bound, even in boss versus city. And why isn't there a threat of harm to the baby? Because if we go back to the severity, the very beginning, one of the issues was kidnapping. That's what they alleged. And we challenge that because Sean is the biological father. They could have confirmed that there was an allegation that said, let's assume it's not kidnapping. It's that a guy with a gun is fleeing with a baby and there's potential harm to the baby. It doesn't matter whether you're a biological father or not in that circumstance, right? In that circumstance, yes. But in this circumstance, it does matter. Because if it's the biological father, just like me, I'm divorced. And I said I took my child and my ex-wife says, oh, he kidnapped his daughters. No. I already had asked you to ignore the kidnapping and just think about the circumstance in which the officers come across this gentleman. Because that goes to severity. The very first thing is severity. They jumped and artificially went to the highest severity they could. Kidnapping. Now, if they said it's the biological father, the severity comes down because that's how it was framed. What's the severity of the issue, right? And the next one was whether he was actively evading. And at that point, that factor is, do you take the 30 minutes or you take it around the corner? Do you take the totality? Let's take the totality. But still, the totality says when, at what moment? Because we are saying he surrendered. He was attempting to comply. Now, if he's attempting to comply and he's surrendering, that's a different matter. Even the Sixth Circuit have said that in Williams v. City of Burlington. When somebody's attempting to surrender and they have surrendered, any deadly force is unreasonable force. And even in Gardner, which they have cited, where he was actually fleeing and he was going away and he was a felon. They said, no, if he's no immediate threat, that force was unconstitutional. And that's what we're saying here. As I see the video of the shooting, it's pretty clear at the time that he's shot, he's no immediate threat to the officers. He's holding a baby. He's at some distance from them. We often see cases, well, he's close enough, maybe you could have run at them with a knife and so on. But he's holding a baby. He's some distance away. The officer shoots him within about a second. If we're worried about safety of the baby, one of the things that strikes me is he's been holding that baby for half an hour. As he's eluding the officers, he's still holding the baby and the baby is unharmed. And that's what we're wanting to say, Your Honor, is Scott versus Harris, the Supreme Court. They said, what does the video show? What does the video actually show? Does it blatantly contradict our position? We say, no, that video does not blatantly contradict our position. If that's the case, you got to believe the plaintiff's version of events. Also, during this whole time, the 30 minutes, there's this accusations about jumping fences, going over, scaling fences. What we have is no evidence that any officer actually saw that. That's how we distinguish it from Fourette. And Fourette officers actually saw him scaling the fences, jumping fences, going away. And even in Fourette, he said, yes, I was consciously evading. I was trying to get away. Even if we assume that there is a constitutional violation, what's your best case that shows it was a clearly established right? Well, the best case, and those are two good questions, because you're going to go to George versus Morris, 9th Circuit. But you're also going to look at the Aguilar case. OK, in George versus Morris, even if we were to agree with you that the moment when the shot was fired, there is a question about whether or not the officer believed there was going to be harm to the child in your client's case, which might be analogous to whether or not a gun is pointed at an officer or the ground. In George, there wasn't sort of this preceding 40 minutes of a chase in which there had been directives and commands to stop, I think, 20 seconds before the shot was fired. The officers commanded Mr. Furr to stop. He didn't stop. He continued to run. And so I'm having difficulty, even if I were to look at just the moment in time, I can see sort of the similarity between George, the facts in George and the facts in this case. But in George, we don't have this longer period of time that we need to take into account. And, you know, the Supreme Court has repeatedly chastised courts for expansively considering the clearly established prong to include circumstances that are different than ones where courts have found there is a clearly established right. So how do we use George as a case that clearly establishes the right in this case? The clearly established prong cannot even be met under this Ninth Circuit, under the estate of Aguilar versus County of Riverside. It says it cannot be resolved on summary judgment if the facts are clearly disputed. Quote, that's where the officers shot him six times. And the quintessential question, the fact is reserved for the jury and precludes summary judgment on the excessive force claim. That was a level of threat. What level of threat is he at that moment? And even the Ninth Circuit has said, no, that goes that's a question of fact for the jury. Another case that I could say is Poole versus Shreveport. That was where Mr. Poole was driving a truck, right? A neighbor sees him driving back and forth, calls the officers and said, I'm concerned about this. Officer comes, Officer Brissino, he goes behind and he parks behind Mr. Poole, turns his lights on. Mr. Poole doesn't stop. Mr. Poole is actually on parole. So he's concerned. He's having suicidal thoughts. Drives off. Six other officers come and join Officer Brissino. Mr. Poole is still driving his truck. He leads them on this chase for more than 15 minutes, I believe, going and avoiding the traffic signs. They put spike strips out, goes on the wrong side, drives over two lawns for 15 minutes. All of a sudden he parks, jumps out quickly, as the court said hastily, and goes to the back of his truck, puts his hands into the bed of the truck. And this is where the divergence of the cases go. The officer says, I couldn't see his hands. I told him to stop, show me your hands. He did it. He turned. I shot. That case, there was also objective evidence, the body cam, the dash cam video. And the Fifth Circuit said, look at the objective evidence. What does the objective evidence say? One of the difficulties I have on the qualified immunity is that we have all these cases, but most of them relate to officer safety, which we don't really have here. And we have Officer Zeck saying he feared the baby would be used as a hostage. So do you have any other cases that you can point us to that would really bring up this situation, where we're focused on the baby and not the officers? And that's what we're trying to say, Your Honor. No, I mean, first answer, Mike, do you have any cases that I should be looking at with respect to a potential hostage, a baby, a third party? Well, I have it where there's third parties and there's a dysmetric dispute. And that's what I said, George. And then there's also Hayes v. County of San Diego, where the court has said, look, we know these situations might be potentially volatile. We understand that. There's maybe a weapon involved. But I just said officers must use deadly force against threatening suspects, even though suspects are armed. They can't use deadly force. What about with Hayes v. San Diego? Because does that involve a hostage or a third party? Or is that the officer directly with the individual being pursued? That's an officer. But I also want to say on this. I mean, so I'm trying to get we have to get a little more granular, because we have we know all these cases about officer safety, concern about warnings that should be giving that sort of thing. But I'm really focused because of what the Supreme Court has said on this more specific issue of a third party or a hostage. And I'm looking for a case that would have those contours. And I guess you're telling me we don't have those. We just have to analogize. Is that right? That's what I believe. What would you say about the Supreme Court's decision in Casella v. Hughes, which is a case where officers had mere seconds to assess the potential danger to a bystander, even though the officers themselves were no apparent danger. Isn't that a case where the Supreme Court found that the right was not clearly established? Well, how do you distinguish this case from Casella? How we distinguish this case from this is the bystander, because in this case, we still have a subjective interpretation. And that's why we have a video evidence here. I don't know if there was a video evidence. Here's there's a video evidence. And that's what we're saying. That's reserved for the jury. Right now, we're making interpretations. He's using the child as a shield. Well, who's making that interpretation? That's a subjective word. How is that? What does the objective evidence say? Look at the video. If those are negative facts and the jury comes to that conclusion, then we'll deal it. But at that same point, what even the Supreme Court has said in Tolan v. Cotton says, if there's material facts in dispute, look and favor the non-moving party. Because in Tolan, when he was 17 years old, he was driving his pickup truck. And the officer pulled over and said, hey, this is a stolen truck. Get out, hands up. He was at his home. And even his parents come out and said, no, there's nothing wrong. He goes, that's my truck. They're like, no, get your hands down. At that point, there's a dispute as to what happened. Officer claims, I just grabbed the mother. She fell down. That's how she got injured. Tolan said, no, he grabbed my mother, threw her down. That's how she got the bruises. And even the Supreme Court in Tolan v. Cotton has said in excessive forces case where they denied qualified immunity and denied summary judgment says, believe the non-moving party, their version of events. And then even that would go over that would be U.S. for Scott v. Harris. What does the objective evidence say? That goes to the jury. So the Supreme Court has held, look, when there's dispute of facts, that goes to the jury. If there's objective evidence, that's like another witness. What is the witness going to say? That goes to the jury. Here, the court disregarded that and said, no, I can interpret that because they said, I could see he's eyeing the fence. I can see he's going to escape. Those are all subjective. That's interpretations. That's credibility. That's what the court has done. And that's reserved for the jury, not a judge. Would you like to reserve the balance of your time for rebuttal? Yes. Thank you. Thank you. You want to move the podium down? I was just. Can you hear me OK? I can hear you. Are you comfortable? I think this is fine. OK, thank you. All right. Thank you. May please the court. Rebecca, we're Dean on behalf of the defendant, city of Seattle and Sergeant Noah Zack. There are two overarching reasons why the district court's summary judgment order should be affirmed in this case. And the first is that it there are alternate grounds supporting the decision below that have been waived by the plaintiffs in this case. So it's the city's position that the court does not even need to get to the merits of the arguments based on that waiver. Generally, a district court's order will not be disturbed on appeal if it rests on grounds that the appellant did not oppose in the district court. And or raise in the opening brief here, the district court's order rests on grounds that were completely unopposed below by the plaintiff plaintiffs. And with one possible exception, were not argued in the opening brief. These unchallenged grounds taken together dispose of all of plaintiff's claims. Thus, the court need not reach the merits of the case. Which is the second route that supports affirmance. The city argued below that the plaintiff estate and plaintiff defunct of fear were not properly before the court. Because the estates had not appeared through an authorized personal representative. And the amended complaint that named plaintiff Devon to fear as a plaintiff had never been filed. So those two- I know the city raised this in, I guess, a footnote in the motion for summary judgment. And then later around the time before the summary judgment was decided, council brought to the attention that through the superior court there had been an appointment of an appropriate representative, right? Your Honor, there is no evidence in the record that that was brought to the court's attention. Certainly not in conjunction with the summary judgment motion. Well, I don't think it was in conjunction with the summary judgment motion. It was just a filing, I thought. It was in connection- That said, FYI, we have fixed the problem. Although they did not actually move to substitute. Correct. It was in connection with an entirely unrelated motion that was filed later in the case. Correct. A motion to continue trial. But before the summary judgment was decided, correct? It was never ruled on. The problem is, I don't- Well, let's get the chronology straight. Right. We've got a motion for summary judgment pending in the district court. Then we have a motion for continuance, and this information is brought up. That's never ruled on before, but it's pending at the time the district court issues a decision, correct? That's correct. And I think the problem is, because it was never considered or ruled on, that there's no evidence in the record that the court even saw that exhibit that was filed in connection with that motion. That motion was moot, given the consideration of the motion for summary judgment. It's filed. It's public. It's there. So you're saying, well, maybe the district court didn't look at it or didn't see it, but it's there in the record. It is on file. That's correct, Your Honor. It was not brought to the attention of the district court in consideration of this motion. I think if the district court had known about it, it would have mentioned it in the order. Doesn't Rule 17 require that after an objection, a reasonable time is allowed for the real party in interest to be substituted into the action? Well, Your Honor, that argument was never made by the plaintiff in its opening brief, in their opening brief. And we've not had a meaningful opportunity to brief that argument. It's being essentially raised here for the first time. So I believe Rule 17 does contain a requirement that there be a reasonable time to amend. We need only look at the rule to be able to see that the district court abused its discretion by declining to allow the plaintiffs an opportunity to substitute. Well, Your Honor, they didn't decline. They were never requested to have that opportunity. Plaintiffs never requested it. It was brought to their attention. Plaintiffs never asked the court for an opportunity to amend. I don't read the rule to require the plaintiffs to make a specific request, only that a reasonable amount of time be provided to allow for that to occur. It was also never raised in the opening brief, Your Honor. It's an argument that needs to be made by the plaintiff, I would argue. And for their failure to raise that, it's now been waived. Okay, so let's turn to the merits. I would like to have you respond to the arguments that were made today on the issue and in the briefs that if the body cam provides at least some question about the subjective intent of the officers with respect to the fear that there would be harm to the baby, why isn't that enough if we view the facts in a light most favorable to the nonmoving party to go to the jury on the issue of excessive force? Well, Your Honor, I believe the standard is what a reasonably objective officer in Officer's ex shoes would reasonably believe at the time, given the totality of the circumstances and the information that that officer knew at the time. The video is objective evidence of what happened, and the court must take the look at the facts in light of what the video depicts. And the officer at the time confronted a situation that was extremely dynamic. It was extremely fast between the time when he first spotted Mr. And, uh, you know, he had his he and other officers had his weapons pointed at Mr. Fear ordered him loudly to stop. And Mr. Fear after the order was given to stop, was he given an opportunity to comply with the order or was he shot more or less simultaneously with the order being given? Your Honor, I'm speaking of the time when they first encountered Mr. Fear. How many orders to stop? How many orders to stop were made? Well, there were several officers shouting stop, Sean, stop loudly when he was first spotted and as he was running away from the officers. That can be heard clearly on the videotape. And I'm much more interested in a constructionist to him to stop when he's walking toward the officer with the baby in his arms and he's shot. What I'm what I'm suggesting, Your Honors, is it's one continuous. I know, but I'm asking about this particular piece of that continuous interaction. You can you can hear it on the video. It is very quickly. It is. It is. And that's the shot comes pretty much right after that. It seemed struck struck me as it was essentially simultaneous. It was it was close to being simultaneous. Your Honor. That's what it reflects. And how far will are actually says, did you think there was sufficient time to allow Sean to stop? And he says no. But of course, that's one officer. And then we have officers that.  Your Honor. Again, the time between when they first spotted Mr. Fuhrer and he began running away and the time the shot was fired was approximately nine seconds. This was not an two separate incidents as plaintiffs have been trying to portray it. This was essentially a 10 second period of time. That's very short. And during that time, Officer Zeck is pretty much on the run. He's he's gravely concerned about this child that he had just seen. He had just seen Mr. Fuhrer running away with a child holding her in one arm, low on his hip. One officer described it like a football with just utter disregard for her safety and her limbs were flopping around. Do we have any cases that would take into account a scenario like this where there are several periods of time, sort of one that preceded another, where an officer would be able to know that if you make a command to stop and and the person does not stop and continues to run and then you encounter them, you know, in short order thereafter and you make a command and they and immediately shoot or simultaneously shoot, that that would constitute a clearly established right that's been violated. Because the way I read the cases and you probably heard my questions to your friend on the other side, I think George might be a similar case, but for the fact that there isn't the sort of preceding period of time, as you're describing, occurred in this case. And I think the main distinction between this case and all of the other cases cited by plaintiffs, including George, is that in this case, the the suspect is holding a baby as a hostage and there is a direct threat to that. You say as a hostage, that's a very loaded word. Usually hostage means I'm holding this person, this child until you give me something like money. He was holding out. I'm not sure we're talking hostage. Well, your honor, it was hostage has a very specific meaning. And I'm not sure that this is a hostage situation. He was clearly holding the baby. I get that. But hostage. That's a that's a specific, very specific word. Again, your honor, we have to look at what the facts that were presented to Officer Zack at the time, which was that there was probable cause to arrest Mr. for a felony domestic violence assault with a firearm and kidnapping. Yes. I'm waiting for I'm waiting for you to tell me why this is hostage. Well, I'm sorry, your honor. I'm getting to that because of the kidnapping charge. He could presume at that point that Mr. that officer that Mr. Fuehrer had the baby unlawfully, that this was not a baby that he was entitled to have possession of. Yeah. Or to have custody. I have a different definition of the word hostage. Yeah. So even even if we were to credit that the situation didn't present an immediate threat to the officers and credit that there wasn't an immediate threat to the baby. And I'm just asking you to assume that I know you would disagree. But would you still prevail on qualified immunity and why? If there was no threat to the baby, I'm presuming that you're asking me to assume if there was zero threat to the baby. Well, you know, if you if you don't have the immediate threat, do we have cases that say, well, given that with a whether you want to call it a hostage or a third party that is, you know, involved a baby being dangled or at this point, not dangled, but held. Are there any cases that are close to that? Well, I would I would argue that the cases cited in our brief are close to that because, for example, the Fourette case, the little case in the Vasquez case, all of those cases, none of the. Backed in for it was was actively escaping at the time he was shot for me. The suspect in the fourth case was actively escaping at the time he was shot. So how how does that square with the facts in this case, which is not what happened? Your Honor, I would disagree with that. I would I would say that there is no evidence in this case that Mr. Fuhrer was not trying to evade at the time he was shot. He had he had he was actively running away from officers. He came to me. I watched the body cam video. I think there is at least some question that he might have been surrendering at the time that he took a step forward. Twenty seconds before that, when he was running in the opposite direction. I would agree with what you're saying, but not at the moment that he was shot. Your Honor, the video shows that he was continuously advancing. He never stopped at any point of time before he was shot. He could it is I would argue it is speculation to say that he was surrendering at that time, because given all of his continuous conduct up until that point in time, and it was only 10 seconds before he was given a clear opportunity to surrender. And he did not. But you're saying he could have jumped that fence like for it. He could have gone to his right. Pardon me for interrupting. But you're saying he's trying to escape as he's walking toward the officers. Yes, Your Honor. He's never stopped. But he's walking toward the officers. He's not walking away from them. At that point, he he faced the fence. He had to turn because of the fence at that point. No, no. My point is, it's hard to say he's running away from the officers when he's facing them and walking toward them. He's not running away. I would agree with that, Your Honor. But would you agree that he's walking toward the officers? I would agree he's walking toward the officers at the time he was shot. But, you know, it's really an odd thing because we're telescoping on this corner, you know, a fence corner. So can you just remind us in terms of the chase or the talking to him where the officers are? Vis-a-vis him during the chase or the running. Sure. And then how they end up in this situation where he's in the corner of the fence and they're in front of him. Yes, Your Honor. So basically what the officers did was they assumed they they took a parallel path to the path that Mr. Fuehrer, they assumed that Mr. Fuehrer would be taking behind the residence. So in essence, Mr. Fuehrer, they had seen him go over a fence and behind this residence and went out of view. They took a path in front of the residence, like a residential townhouse buildings. They went in front, rounded the corner where the fence was, and then encountered Mr. Fuehrer, who was coming up the back way. So there was a fence on one side of Mr. Fuehrer. And then there was a townhouse building with with a sidewalk or backyards where he could have gone, you know, that opposite sort of the direction he just came back. He could have gone that way. He could have tried to go over the fence. That's the point. At the point that he was shot there, Officer Zeck had to make a very split second decision. He knew he had a an opportunity to end the threat, a very significant threat, he believed, to that child who was probably the most vulnerable third party imaginable to be put at risk by this behavior. And he made that at that moment, he made the decision to end the situation rather than to see what would happen next. If he had waited, it could have been that Mr. Fuehrer could have taken his gun and put it to the baby's head, could have thrown the baby at at the officers to distract him to try to get away. And up until that point, Mr. Fuehrer had exhibited nothing but evasive conduct. He had been given a clear opportunity to surrender and he did not. He chose to run away from officers. So at that moment, there was nothing that suggested to Officer Zeck in that split second moment where he could have ended that. He knew he could have ended the situation. There's nothing to indicate that the baby's life would be 100 percent safe if he had not taken action. And I think that's the main point on the use of force in this case, is that the totality of the circumstances have to be taken into account, not just a split second of a video. And under those circumstances, Officer Zeck's use of force was legally permissible. And I'd also like to address the qualified immunity issue quickly. You're out of time, so maybe just take a few seconds to make your closing remarks. And if you want to address this, that's fine. Thank you, Your Honor. My point is there's even if the court finds a constitutional violation, officers actually be entitled to qualified immunity because there is no case in the Ninth Circuit or elsewhere that would have put him on notice. That's all on all fours. Counsel, that's the question that Judge McKeon and I have been asking you for the last 15 minutes. You say there's no case, and he says, well, but look at these cases. I would just refer the court to the briefing. Our response brief answers those questions and distinguishes the cases that counsel has raised. Basically, there's no threat to a third party in those cases, and that's what really distinguishes them. All right. Thank you. Thank you, Your Honor. I want to bring another case to the court's attention, Zion v. County of Orange, where there was interpretations of what the body cam video showed. The Ninth Circuit in that case reversed and said there's competing versions of events, so we're going to reverse that. In Zion, he was shot and killed. Then there was a movement. Officer said he's still continuing to fight, shot him several more times. The body cam video showed otherwise. It said, look, that could be interpreted as involuntary movement. So in this case, we're saying if there's multiple versions of events to be believed, and at this point, the summary judgment phase for Rule 56, you have to credit our version of event, then it goes forward. I also want to address an issue about procedurally the personal representative in state law. Rule 17b says that capacity to be sued is determined by state law. The probate courts and even the Washington Supreme Court in Ann Ray Estate of Jones in Bonk 152 Wash 2D1, 2004, said that decision is determined by the probate courts. Here, in this case, we have an order and we have letters of administration. Right, and you don't, you know, we're not supposed to hunt and peck through the record. You never did ask the federal court to substitute the party, correct? That is correct, Your Honor. That would have been, we wouldn't even be talking about that. You could have just filed a motion and said, hey, forget all this discussion. We've got the right person here now as the party. And what I'm saying, Your Honor, even under state law, if you have the wrong person, you have to cancel those letters. You have to move to say, because even in state law. No, it doesn't matter. We're in federal court where you have the wrong person to start with. And now you have a chance to fix it and substitute the right person. But you don't ask the court to do that. What I'm saying, Your Honor, is even if you have the wrong person, you have to get the letters revoked. Right now, those are still the right person because the letters were issued. So that is the right person. Now, if you want to counsel him and say, challenge it. I want to challenge that he's the PR. That's different. And that's what we're saying. Well, no, so you think even with a felony conviction you had the right person? Well, what I'm saying is, Your Honor. No, no, yes or no. Did you have the right person? You could have fixed this in 22 seconds and we wouldn't have all this briefing and argument. And that is true, Your Honor, but what I'm trying to tell you is we had letters issued. So we were operating under that. When Mr. Furr, and it was brought to his attention it was a felony, that's when we went back. So we were operating. He was the correct person. Here, the letters of administration said he is appointed as a court administrator. So we had, and we're acting under that authority. Now, if you want to challenge it and say, hey, there's an issue with that. The state law says, this is how you challenge it. The cancellation of letters under RCW 11-28-160. The revoking of letters. And it even mentions, if there's a felony, this is the steps you take to revoke the letters. Until they're revoked, those letters are valid. And that's what I'm saying. You haven't really answered the question of why didn't you just file a motion. But we'll leave that where it is. And we focus today on the substance of your case. And I guess my point being is we were moving that way. And we always informed defense counsel. Defense counsel was actually at the hearing when we were moving for the personal representatives. Thank you very much for your argument. Thank you. Thank you to both counsel for your helpful argument this morning. This matter is now submitted.
judges: McKEOWN, FLETCHER, DESAI